1

2

3                                                          O

4

5

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11                   CENTRAL DISTRICT OF CALIFORNIA

12

13   UNITED STATES OF AMERICA,    )  Case No. CR 04-00860 DDP
                                  )
14                  Plaintiff,    )  **ORDER GRANTING NEW TRIAL**
                                  )
15        v.                      )  [Motion filed on March 3, 2008]
                                  )
16   ALBERT LAMONT HECTOR,        )
                                  )
17                  Defendants.   )
     _____)

18

19

20

21        This matter comes before the Court upon Defendant's motion to

22   dismiss the indictment for outrageous government conduct or, in the

23   alternative, for a new trial.  After reviewing the materials

24   submitted by the parties and considering the arguments therein, the

25   Court GRANTS Defendant Hector a new trial.

26   ///

27   ///

28   ///

1

2

3  **I.   Findings of Fact**

4       **A.   Procedural History**

5       On July 9, 2004, a grand jury in the Central District of

6  California returned an indictment charging Defendant Albert Lamont

7  Hector with possession with intent to distribute cocaine base (21

8  U.S.C. § 841), possession of a firearm in furtherance of drug

9  trafficking (18 U.S.C. § 924(c)), and being a felon in possession

10 of a firearm and ammunition (18 U.S.C. § 922(g)(1)).  The charges

11 arose from the execution of a search warrant at Mr. Hector's

12 residence on June 2, 2004, where Los Angeles Police Department

13 ("LAPD") officers found 6.46 grams of cocaine base, $4,361 cash, a

14 loaded .45 caliber Glock semi-automatic pistol, and a magazine

15 containing live ammunition.  At the time the warrant was executed,

16 Defendant was the only person in the apartment, and was arrested.

17      At Mr. Hector's first trial, which commenced on December 7,

18 2004, the Government relied wholly on circumstantial evidence in

19 its case in chief: the cocaine, firearm, ammunition, and money that

20 were found during the search.  The defense called Officer Michael

21 Fletcher, the LAPD lead officer on the case, as an adverse witness,

22 to testify that 1) the police did not find many of the items that

23 one would typically find in a drug dealer's apartment; 2) Mr.

24 Hector had time to dispose of the cocaine base but did not; and 3)

25 Officer Fletcher had no personal knowledge that Mr. Hector was

26 dealing drugs out of the apartment.

27      This Court had no choice but to declare a mistrial after

28 Officer Fletcher essentially blurted, during the Government's

examination, that a controlled buy had occurred at Mr. Hector's house earlier that day.  It is undisputed that Officer Fletcher did not witness the alleged buy, and the Government had not introduced evidence of the buy in its case in chief.

Prior to retrial, Mr. Hector moved to dismiss the indictment on double jeopardy grounds, arguing that Officer Fletcher had intentionally provoked a mistrial.  In the alternative, Mr. Hector moved to preclude the Government from introducing evidence at a retrial that it had chosen not to introduce at the first trial. The motion was denied in its entirety.  At the retrial, the Government altered its trial strategy and presented evidence of the buy referenced by Officer Fletcher in the first trial.  The Government's evidence of the buy came in primarily through the testimony of a paid confidential informant ("informant").

Mr. Hector denied knowledge of drug sales at the apartment. He explained that the cash belonged to his friend, Jordan Berhe; Ms. Berhe, who testified that she owned the neighborhood market and had been robbed once making a deposit alone, corroborated this explanation.  Mr. Hector and his apartment manager both testified that he had a roommate – also an African American male, around the same age, height, and built – who had not been seen since the night in question.  Nevertheless, the informant identified Mr. Hector as the person from whom he had purchased drugs.  Mr. Hector was convicted.

Post-trial, this Court granted a motion for judgment of acquittal as to Count 2 of the indictment.  In addition, the Court granted a motion to suppress evidence based on illegalities during the execution of the warrant; as a result of the suppression, all

1  the convictions were necessarily vacated.  Then, relying on a

2  change in the law set forth in an intervening decision by the

3  United States Supreme Court, the Ninth Circuit Court of Appeals

4  subsequently reversed these orders.  See <u>United States v. Hector</u>,

5  474 F.3d 1150 (9th Cir. 2007).  Mr. Hector now brings a motion to

6  dismiss the indictment, or, in the alternative, a new trial.  This

7  motion is founded in Mr. Hector's allegations that the Government

8  committed outrageous misconduct by failing to discover and disclose

9  impeachment information regarding the informant.

10      **B.    Defense Requests and Court Orders Regarding Informant and
             Police Witness Information**

11

12      On July 24, 2004, two days after Mr. Hector was arraigned,

13  counsel for the Government called defense counsel Davina Chen

14  asking if Ms. Chen wanted discovery, whether she would be ready for

15  trial on August 31, 2004, and whether Mr. Hector wanted to plead

16  guilty.  (Chen Decl. ¶ 3.)  That same day, Ms. Chen sent a written

17  discovery request.  That request explicitly asked for discovery

18  including, but not limited to "records of any 'controlled buy' that

19  was the basis for the search warrant in this case," the name and

20  address of "any confidential informant," and impeachment material

21  on any government witness "whether or not they will be called at

22  trial."  (Mot. to Dismiss, Ex. A.)  On July 26, 2004, the

23  Government sent defense counsel 66 pages of discovery via a form

24  letter, but did not respond to any specific discovery request.

25  (Chen Decl. ¶ 5.)  Ms. Chen then made two subsequent, increasingly

26  specific written requests for discovery, again including but not

27  limited to information related to the confidential informants.

28  (Mot. To Dismiss, Ex. B, C.)  Defense counsel also called

government counsel regarding the discovery requests.  Although the
Government "repeatedly advised . . . that [government counsel]
and/or the case agent were 'looking into' [the] requests,
[government counsel] did not actually produce anything."  (Chen
Decl. ¶ 6.)

On September 1, 2004, Defendant filed a motion to compel
discovery.  On September 3, the Government sent additional
discovery, including the rap sheet of the informant with all
identifying information (including nine names/aliases) except for
the case numbers redacted.  The Government also filed a "Notice of
Non-Opposition" to Defendant's discovery motion, in which it
advised the Court that the Government was "in the process of
responding" to the requests.  (Id. Ex. E.)  Defendant filed a reply
advising the Court that, although it claimed to be "in the
process," the Government had not actually responded to multiple
specific discovery requests.  (Id. Ex. F.)

On September 13, 2004, the Court held a hearing on Defendant's
discovery motion.  At the hearing, defense counsel expressed her
concern that even though

> the case law is clear [that the Government] is under the
> obligation to make herself aware of any impeachment or
> exculpatory information that is in its hands or is known
> to anyone working on the Government's behalf[, i]t
> doesn't appear to me that [government counsel] has been
> inquiring specifically as to these items.  The reason I
> say it doesn't appear to me, I asked for discovery, and
> the responses are – they tend to be vague.  'I am not
> aware of that.'

(Id. Ex. G, at 80.)  The Court then emphasized to the government
counsel that she would have to make

> a representation as an officer of the Court that she has
> exercised due diligence, that she has made all of the
> inquiries that she is obligated to do, that she has made

1        those inquiries in a diligent and direct manner and that
         there simply aren't those things, but Miss Chen is right,
2        your obligation extends to make inquiries, and those
         inquiries have to be significant.  Do you understand
3        that?

4        **THE GOVERNMENT**:  Yes, your honor.  We have produced the
         rap sheet of the informant.
5
         **THE COURT**:  That is not the issue.  The first issue, just
6        so we take it in order –

7        **THE GOVERNMENT**:  Yes, your honor.

8        **THE COURT:**   The issue is the sufficiency of your
         inquiries.  That is very important.  Okay.
9        So can you represent now what you have done in that
         regard or in light of this discussion do you want to
10       think about it and inquire further?

11  (Id. Ex. G, at 80-81.)

12      Government counsel then again expressed that she had produced

13  the rap sheet of the informant, and then said "I am not sure what

14  else the defense has in mind."  (Id. Ex. G, at 81.)  Defense

15  counsel explained that she wanted information regarding benefits

16  received by the informant, any history of dishonesty, and anything

17  else that would bear on the witness's credibility.  (Id. at 82.)

18  The Court explained to the Government that "you have to inquire of

19  those specific items, if people are testifying as informants,

20  anything they might have received."  (Id.)  The Government

21  responded "We will get that for her, your honor."  (Id.)

22      In addition, the question of disclosure of the informant's

23  identity was discussed.  (Id. at 84-90.)  In a closed hearing, the

24  Government advised the Court that the informant's identity needed

25  to remain secret for his protection; the Court ordered disclosure

26  by September 21, 2004, noting that trial was rapidly approaching,

27  and that the defense was "entitled to know the identity of [the

28  informant] at some point."  (Id. at 89.)

1    Accordingly, the Court makes the following findings:

2    A.    The Court finds that defense counsel explicitly requested

3    on several occasions all information regarding identity of and

4    benefits received by the informant, and any other information

5    bearing on credibility.

6    B.    The Court further finds that it explicitly reminded the

7    Government that it had to make "significant" inquiries in

8    order to obtain this information, and that the Government

9    expressed that it understood its obligations.

10    **C.    Government Disclosures**

11    On September 21, 2004, the Government informed defense counsel

12    that the informant's name was Steven Taylor.  (Chen Decl. ¶ 12.)

13    Defense counsel questioned the veracity of this information because

14    she had learned through an independent investigation that Steven

15    Taylor was **not** the informant's name.  His name was Steven A.[1]

16    (Id.)  The Government also provided redacted payment information

17    for the informant for the year 2004, and made the following express

18    affirmative representation: **"There is no impeachment information**

19    **for the informant who will be testifying, other than what has**

20    **already been provided to you."**  (Mot. To Dismiss, Ex. H. (emphasis

21    added).)

22    The Government also represented that "[w]e are not aware of

23    any impeachment information for the police officers who may be

24    testifying.  I use the word 'aware' because we do not have

25    possession, custody, or control over the disciplinary files of the

26    police officers."  (Id.)

27    _____

28    [1] Although the informant already testified at trial, the Court
has redacted his full name in an abundance of caution.

7

1   The Government does not contend that it made any inquiries or
2   performed any investigation between September 13 and September 21,
3   other than receiving the payment information regarding the
4   informant that the LAPD affirmatively offered, in order to reach
5   the conclusion that there was no available impeachment material
6   regarding the informant.  The Government does not contend that it
7   made **any** inquiries whatsoever in order to reach the conclusion that
8   there was no impeachment available regarding the police officer
9   witnesses.  Therefore, the Court finds that, in clear violation of
10  the Court's directives at the September 13 hearing, the Government
11  represented a lack of impeachment material without making the
12  "diligent and direct" inquiries necessary to make that
13  representation.  (Id. Ex. G, at 81.)

14      After receiving the Government's assurance that there was no
15  further impeachment, defense counsel nonetheless continued to
16  request discovery of impeachment material and to remind the
17  Government that it had a continuing obligation to discover and
18  disclose exculpatory evidence, including impeachment material,
19  under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  (See Mot. To Dismiss,
20  Ex. I, J.)  In one letter, dated November 22, 2004, defense counsel
21  specifically requested answers to the following questions:

22          ● Did [the informant] just begin informing in 2004 –
23            if not, please provide complete discovery of payment
              sheets.
24          ● Has he received any assistance other than cash, for
              example, help with cases, etc?
25          ● How much will he receive for his court testimony in
              this case?  Is the agreement in writing or is it
              oral?
26          ● Has he previously testified in any other cases?  If
              so, what are the names of these cases?
27          ● Do you or the LAPD have any information that he has
              ever been unreliable?
28          ● Does he have any substance abuse, medical, or other

8

1                          problems that would bear on his testimony?

2 (Id. Ex. I.)

3      In response, the Government represented:

4 Here are the answers to the questions in your letter dated November 22, 2004:

5 (1) Yes, the informant began informing in 2004.

  (2) He has not received any assistance other than cash.

6 (3) He receives a flat $90 fee for cases in which he will testify.  This agreement is oral.

7 (4) He has not previously testified.

  (5) Neither the Government nor LAPD have any information that

8 he has been unreliable.

  (6) He has no substance abuse, medical, or other problems

9 bearing on his testimony.

10 (Id. Ex. K.)

11      Although the record does not reflect the basis for the

12 Government's answers, it does reflect that the answers were

13 largely false. The informant had been informing off and on since

14 the 1970s; he had previously received police assistance other than

15 cash; he was a cocaine addict, was blind in one eye, and had

16 glaucoma in the other.

17      The Government made no additional disclosures related to the

18 informant prior to the first trial.  After the first trial ended in

19 a mistrial, the Government faxed defense counsel a letter advising

20 that the informant had "worked once as an informant for the

21 California Highway Patrol, in a murder-for-hire case with the

22 Culver City Police."  (Id. Ex. L.)  The letter asserts that

23 "[a]lthough he showed up for court, he was not called to testify"

24 and that "he has not worked as an informant with anyone other than

25 LAPD, aside from this 1998 case."  (Id.)  The following day – **the**

26 **day after** the first trial ended in a mistrial - the Government

27 called defense counsel and informed her that the informant "also

28 goes by Steven A."  (Chen Decl. ¶ 19.)  The Government then filed a

1  Notice of Intent to introduce at the retrial evidence of the buy
2  the informant claimed to have conducted.

3      The Court finds that by this point the Government already had
4  to correct several pieces of misinformation about the informant; to
5  wit, the Government had corrected his name because the initial name
6  provided proved to be an alibi, and discovered that his history as
7  an informant in fact began years earlier than 2004.  The Government
8  therefore had every reason to be on notice that the informant might
9  have credibility problems, and to investigate further.  As the
10 Court noted at the December 13, 2004 hearing: "If somebody is using
11 other assumed names, that calls into question their credibility
12 sort of ab initio; doesn't it?"  (Mot. To Dismiss, Ex. O at 142.)

13     **D.   Defense Investigation**

14          **1. Informant**

15     During the pretrial period, defense investigation was ongoing.
16 When the Government produced the informant's rap sheet on September
17 1, 2004, it - perhaps inadvertently - did not redact the case
18 numbers related to the informant's prior arrests and convictions.
19 By obtaining these records, defense counsel learned the informant's
20 identity (Steven A) as well as details regarding his background
21 that the Government had not disclosed, including that he was a drug
22 addict who committed crimes to support his habit, and that he was
23 blind in one eye and had glaucoma in the other.  (Chen Decl. ¶ 22.)

24     Defense counsel learned that the informant had provided
25 information to the authorities in efforts to obtain favors and
26 leniency as early as the 1970s and that by 1984 he was considered
27 by the West Los Angeles Police to be a "reliable snitch."  (Id. ¶
28 23.)  By obtaining his driving record, defense counsel learned

1   that, despite his claims to be able to obtain employment driving

2   trucks, the informant had not possessed a driver's license since

3   1984; by obtaining records of his attempts to obtain a driver's

4   license, defense counsel learned that informant had lied on his

5   Department of Motor Vehicles ("DMV") application forms, for example

6   by applying for a "duplicate license" and stating falsely that he

7   currently had an unexpired license.  (<u>Id</u>. ¶ 24.)

8        Specifically, on December 11, 2004, after the Government

9   advised that the informant would be testifying in the retrial,

10  defense counsel and a defense investigator found and interviewed

11  the informant.  They located him at the Weingart Center, a homeless

12  and drug rehabilitation center in Los Angeles's skid row.  (<u>Id</u>. ¶¶

13  26-29.)  They advised him who they were, and he agreed to speak.

14  When defense counsel asked him about his work as an informant, he

15  explained: "That's what I do."  When she asked him what that meant,

16  he explained that he had been doing it for a long time.  Throughout

17  the interview, he repeated that informing was "what he did."  At

18  one point, he said "a rat is a rat."  When defense counsel asked

19  who else he had informed for, he said "lots of people."  When she

20  asked for specifics, he advised that he had first informed for the

21  West LAPD in the 1970s.  He explained that he avoided prosecution

22  by informing on people.  (<u>Id</u>. ¶ 26.)

23       The informant told defense counsel that he had also informed

24  for the Culver City Police Department and the California Highway

25  Patrol in Riverside in 1998 in a murder-for-hire case.  (Id. ¶ 27.)

26  The informant claimed he had received $10,000 to hire a hit man to

27  kill someone, and that he immediately used $6,000 to buy drugs.

28  The informant stated that he received an additional $10,000 after

claiming that he had not yet found a suitable hit man.  The
informant went to the police, was violated on his parole, and went
to prison.  Upon his release, the Culver City police department
picked him up and gave him $400-500 for expenses.

Contrary to the Government's representation that the informant
showed up for court but was not required to testify, the informant
told defense counsel that the murder-for-hire case never got filed.
(Id.)  This discrepancy is important for two reasons: First, that
the case was never filed suggests that the informant's information
may not be considered reliable; the Government's characterization
(that he was not needed to testify), suggests there was enough
evidence for a successful case without the informant.  The former
serves, needless to say, as much more powerful impeachment
evidence.  Second, whether or not the case was in fact filed is
objectively verifiable information.  The Government either did not
attempt to corroborate the informant's representations, or
intentionally relayed them inaccurately to defense counsel.
Neither is acceptable.

The informant further told defense counsel that he was blind
in his right eye and had glaucoma in his left.  (Id. ¶ 29.)  He
claimed to have a Class A drivers license that had just expired,
but, as noted, defense counsel's research with the DMV revealed
this representation to be false.  That afternoon, defense counsel
faxed a letter and the informant's DMV driving record to the
Government advising that the informant might testify that he had a
Class A drivers license, that the testimony would be false, and
asking the Government to take steps to ensure that the informant
did not commit perjury.  (Mot. To Dismiss, Ex. N.)

1    Based on the discrepancy between the undisputed facts about
2    the informant and the Government's representations (no health or
3    drug condition, history of informing began in 2004, no record of
4    unreliability), the Court can only conclude that the Government
5    either failed to conduct a reasonable investigation, or misled
6    defense counsel and the Court.  Obviously, because such behavior
7    undermines the integrity of the judicial process, neither is
8    acceptable.

9                **2.   Officer Fletcher**

10   Concurrent with the Government's representation that it was
11   not "aware" of any impeachment information relating to the police
12   officer witnesses, defense counsel undertook her own investigation
13   as well.  Although the Officer Fletcher situation is not the focus
14   of the suppressed impeachment material in this motion, the
15   Government's conduct with respect to investigating Fletcher
16   underscores the Court's concern that there may be yet more
17   undisclosed exculpatory or impeachment material.

18   Defense counsel subpoenaed the LAPD discipline records for a
19   number of involved officers.  From the City Attorney's office,
20   defense counsel learned that the United States Attorney's Office
21   had not made any requests related to this case.  (Chen Decl. ¶ 40.)
22   The Government does not contest this assertion.

23   Therefore, the Court finds that the Government represented
24   that it had no impeachment material regarding the involved officers
25   without ever making any inquiries.

26   The City Attorney's office provided officer records to both
27   defense and government counsel on or about October 13, 2004.  (Id.)
28   These records included a sustained complaint against Officer

Fletcher for submitting an arrest report that he knew contained inaccurate information.  Yet, two months later the Government filed a motion in limine to exclude evidence of complaints filed against the LAPD officers on the ground that, inter alia, it was unaware of any sustained complaints that would impact the officers' credibility.  The Government acknowledges that it "must have had the documents at the time" it filed the motion, (Tr. Hearing Apr. 28, 2008, at 30:13-14), so the Court can only conclude that either the Government failed to read the disciplinary reports provided by the City Attorney or that it deliberately misrepresented their contents.  Again, either reason is unacceptable.

Officer Fletcher, of course, proved to be an unreliable witness.  The Court suppressed several of Mr. Hector's alleged statements on the day of his arrest after Officer Fletcher admitted that he had lied in his declaration about what questions he asked Mr. Hector.  Officer Fletcher precipitated a mistrial after testifying about a drug buy about which he had no personal knowledge and of which no evidence had been introduced at trial. Perhaps most importantly, the Government cited Officer Fletcher as the primary source for its information from the LAPD about the informant.  (Mot. To Dismiss, Ex. O at 127.)[2]

---

[2] In response to the Court's questioning about who in the LAPD had provided the information about the informant (which, as noted, turned out to be both false and incomplete), the Government responded:  "It may have been Officer Fletcher, but I don't remember who it was."  (Id.)  Accordingly, either the Government relied on a witness whose credibility it failed to investigate, and who proved to have a record of unreliability, or else it relied on unnamed LAPD sources who it could not recall.  The former bespeaks recklessness in relying on an unvetted source, the latter bespeaks recklessness for completely failing to track the source of information and thus rendering corroboration impossible.

1    The point is this: Although ultimately Officer Fletcher's
2    unreliability was revealed before trial, it might not have been.
3    As far as the Court can discern, the Government made no effort to
4    investigate the reliability of its primary investigative officer,
5    and even when, due to the diligence of defense counsel's
6    investigation, the Government did receive crucial impeachment
7    evidence, it either failed to identify it or affirmatively
8    misrepresented that the evidence did not exist.  This chain of
9    events, in connection with the facts surrounding the investigation
10   of the informant, has convinced the Court that the Government
11   failed to conduct any meaningful investigation for
12   impeachment/exculpatory discovery.  This failure was reckless
13   because, among other things, it ignored direct orders by this Court
14   to investigate further.  The Court is fully willing to believe that
15   Government counsel's performance is due to inexperience rather than
16   improper motive, but the Court is nevertheless left seriously
17   concerned that yet more important impeachment or exculpatory
18   material in this case may remain undisclosed.
19       **E.   Government Response to Defense Discoveries**
20       The Monday after defense counsel interviewed the informant,
21   the Court held a hearing on Defendant's motion to dismiss the
22   indictment.   At the hearing, the Government accused defense
23   counsel of witness tampering:   "We have just learned information
24   this afternoon indicating that we believe the defense has made
25   attempts to prevent [the informant] from testifying."  (Mot. To
26   Dismiss, Ex. O, at 113.)  The Government claimed that defense
27   counsel went to the informant's residence and in the presence of
28   others pointed him out from a distance and said "something to the

effect of, 'why are you testifying against my client?' 'Why are you working for the Government? Don't you know you can get killed?'" (Id. at 114.)  The Government acknowledged that this information came from the informant himself, reported that it was going to move informant "out of his residence . . . [as] a result of defense counsel's actions" because of safety concerns, and then sought a ruling that Defendant be precluded from eliciting this fact at trial because it was a "burden" rather than a "benefit" for the informant.  (Id. at 114-16.)

When defense counsel advised the Court that she had not discouraged the informant from testifying, but that her interview with the informant had uncovered substantial undisclosed impeachment, the Government responded that it had no obligation to disclose what it had not discovered because "there is no Brady violation where the information is not in the federal government's hands," and in any case there was no prejudice because the defense had discovered the information on its own.  (Id. at 138.)

Defense counsel emphasized that given the discrepancies between what it learned and what the Government disclosed, she remained

> so uncertain as to whether or not I received everything.  I received a lot now because my investigative staff has been driving all over the state of California getting information for me, and they took their Saturday to go out and interview the witness with me because I didn't feel comfortable doing that by myself, but this is the information that I have been asking from [the Government] for – I think my first letter was in July.  Your honor, [the informant] also affirmatively misrepresented things to us.  He told us he has a class A driver's license to drive big rigs.
>     I had earlier learned that he was unable to get a driver's license because he couldn't pass vision tests because he is blind in one eye and has glaucoma in the other.
>     When he told me he had a class A, I had my investigator call DMV again because I didn't want to try and impeach an

16

1   informant with information that I was not sure about, so my
    investigator called DMV again and confirmed that he has no
2   driver's license.
          This person is not reliable, your honor.
3         Perhaps we should have him in court, and he can make the
    allegations against me.  I think it was against me and not my
4   investigator, but at this point I am very concerned that we
    are going to go to trial, and all I have is what I learned.
5         I don't know what other <u>Brady</u> there is out there that he
    didn't just openly share with me on that day.
6

7   (<u>Id.</u> at 131-32. (emphasis added).)

8        The Court, too, was concerned about the Government's

9   representations by this point: "I am uncomfortable about the <u>Brady</u>

10  issue at this point just based upon what I have heard."  (<u>Id.</u> at

11  131.)  It further reminded the Government: "You have more than an

12  obligation to simply learn things third-hand.  You have to – if you

13  are dealing with an informant, you have an obligation to

14  affirmatively find out information that relates to that informant

15  that you can reasonably acquire."  (Id., Ex. O, at 125-26.)

16       The Court thus finds that by the beginning of the second

17  trial, the informant's potential reliability problems were well

18  established, and the Government had been on explicit and repeated

19  notice for several months that its method of investigating and

20  discovering impeachment evidence to disclose was unsatisfactory;

21  there was a "big disconnect" between the truth about the

22  Government's witnesses and what the Government had turned over.

23  (<u>Id.</u> at 125.)

24       **F.    Impeachment at Trial**

25       At the retrial, the Government called the informant to testify

26  that he had observed Mr. Hector's involvement with the alleged buy.

27  The informant was the only direct evidence linking Mr. Hector to

28  drug sales.  No witness observed the informant conduct the alleged

1  buy.   The Court finds that the following impeachment information

2  regarding the informant was elicited at trial, either by defense

3  counsel or by the prosecution:

4       •   The informant admitted he is blind in one eye and

5           has glaucoma in the other.  (<u>Id.</u>, Ex. P, at 169 (by

6           the prosecution).)

7       •   The informant admitted he is a former cocaine user.

8           (<u>Id.</u> at 181-82 (by the prosecution).)

9       •   The informant received witness fees of $200 in this

10          case, and was relocated to a hotel. (<u>Id.</u> at 183-84

11          (by the prosecution).)

12      •   The informant admitted to "first" informing "for the

13          police" in the 1970s. (<u>Id.</u> at 185 (by the defense).)

14      •   The informant admitted to being arrested "plenty

15          times" [sic], including for a burglary, to informing

16          to the police to help his cause, and to going to

17          prison. (<u>Id.</u> at 185-92 (by the defense).)

18      •   The informant admitted to being an informant in a

19          1998 murder-for-hire case, and to using a portion of

20          the $20,000 he received to buy drugs. (<u>Id.</u> at 195-99

21          (by the defense).)

22      •   The informant acknowledged that the man he claimed

23          had hired him to commit the murder never went to

24          prison. (<u>Id.</u> at 201 (by the defense).)

25      •   The informant admitted to driving without a license,

26          and to applying for a duplicate driver's license

27          even though he did not have a current valid one.

28          (<u>Id.</u> at 205-09 (by the defense).)

- The informant claimed that defense counsel's
      interview of him placed him at risk, but then
      admitted that he was not "intimidated" physically,
      and that the Government's relocation of him was only
      for five nights. (Id. at 221-22 (by the defense).)

- The informant admitted that he had "told lies in the
      past" to get benefits, but this admission was
      general and not directed at any particular
      instances. (Id. at 250 (by the defense); see also
      id. at 244 (by the prosecution).)

**G.   Post-Trial Discoveries**

The Court finds that the following impeachment material was
disclosed post-trial:

Defense counsel obtained the informant's California Department
of Corrections ("DOC") file.  Pre-trial, the Government had
produced a highly redacted rap sheet, which indicated that the
informant had been convicted of multiple burglaries, multiple
controlled substance offenses, a robbery, and a number of
misdemeanors, and had sustained numerous parole violations.  The
Government did not produce any conviction documents, criminal
complaints, or arrest reports.  Defense counsel was not able to
obtain the DOC file in time for trial, despite a subpoena ordered
returnable on December 14, 2004, the first day of the second trial.
However, the DOC file, once obtained, revealed

> substantial impeachment information, including innumerable
> reports for violations of prison rules and parole; housing
> classification documents indicating that the informant was
> placed in administrative segregation as early as 1986 (having
> been received by CDC in 1985) for what appears to be his
> reputation as an informant; later documents from the 1990s
> indicating that the informant was segregated for having

19

1    "enemies" and a "snitch-jacket"; and other chronological
2    reports indicate that the informant was manipulative with and
     abused his relations with prison staff.  One report indicates
3    the following:  "Inmate . . . is endeavoring to establish
     over-familiarity with staff.  He is in the process of trying
4    to guess this writer's first name and continues to call me
     'Harvey' or 'Marv' and refers to himself as 'dad.'  [He] will
5    become very disrespectful and verbally abusive when his
     requests are denied and **will challenge staff to write reports
6    on him saying that he will beat them by lying**.  [He] feels
     that he has a buddy-buddy type relationship and would like to
7    work the same to his advantage.

8    (Chen Decl. ¶ 38 (emphasis added).)  In addition, in February 2008

9    defense counsel spoke with Lieutenant Chris Gutierrez of the Culver

10   City Police Department, who remembered Steven A. and "recognized

11   him as a sophisticated criminal informant, who knew how to 'play

12   both sides' and to manipulate the police."   (Id. ¶ 39.)  Moreover,

13   Lieutenant Gutierrez stated that none of the informant's

14   information "ever led to any prosecution because there was 'not

15   enough information to prosecute.'"  (Id.)

16        Further, the Government revealed several additional relevant

17   facts during this motion briefing. For example, the Government

18   reveals that the informant was arrested on June 14, 2006 for

19   carjacking and was sentenced to 14 years imprisonment.  (Id.)  From

20   this file, defense counsel accessed a police interview in which the

21   informant offers to testify in another case in exchange for a deal

22   and explains to the police officer:

23        When I go to court it will be a whole different story there
          again, man, you know, if I get passed that thing.  So you
24        know, if I – you believe right here, knowing I'm going to
          court, and I know what I had with [inaudible] didn't work, so
25        I would probably change it up again, you know.

26   (Reply, Ex. S., at 306.)

27        From reading the transcript of a hearing related to that case,

28   defense counsel also discovered that the LAPD had told the Los

20

1   Angeles district attorney's office that the informant had done
2   "numerous undercover buys over a three-or-four year period, and the
3   last time that he had worked for the police was a year and a half
4   or two years ago." (<u>Id.</u>, Ex. T, at 332.)  As the referenced
5   hearing took place in 2006, a portion of the three-to-four year
6   period necessarily predated 2004.  The Government now acknowledges
7   that LAPD records document the use of this informant as far back as
8   1984.  (Gv't Surreply.)  Accordingly, the evidence now shows that
9   not only was the Government's contention that the informant began
10  informing in 2004 wrong, but LAPD's own records prove that point.

11      **F.    Summary**

12      The following two tables summarize the path of disclosure and
13  investigation of impeachment material with respect to the informant
14  and Officer Fletcher, and are helpful in comparing the Government
15  representations with defense counsel's independent discoveries, and
16  the impeachment that defense counsel was able to use at trial with
17  material disclosed only after the fact.  The first table compares
18  the Government's representations with the truth.  The second
19  compares the impeachment that came out at trial with the evidence
20  discovered post-trial.

21
22
23
24  ///
25  ///
26  ///
27  ///
28  ///

**Table 1:**

| Issue | What Government Represented Before 1st Trial | What Government Represented Between 1st and 2nd Trial | Truth |
|---|---|---|---|
| Identifying Information about Informant | · 9/01/04: Provided the rap sheet with all identifying information redacted. <br> · 9/21/04: Told Defense Counsel Informant's Name was Steven Taylor. | · Two days after mistrial, represented that informant "also goes by Steven A." | · Informant's name is actually Steven A. |
| Impeachment Information about Informant | · 9/21/04: Provided Payment info for 2004. <br> · 9/21/04: "There is no impeachment information for the informant who will be testifying, other than what has already been provided to you." <br> · 11/04: In response to specific defense questions, represented that informant began informing in 2004, has not received any assistance other than cash, receives a $90 flat fee for cases in which he will testify, has not previously | · Represented that informant had actually worked once in 1998 as an informant for the California Highway Patrol, in a murder-for-hire care with the Culver City Police. Although he showed up for court, he was not called to testify. | · Informant had been a long time drug addict who committed crimes to support his habit. <br> · Informant was blind in one eye and had glaucoma in the other, and had lied about having a Class A drivers license. <br> · Informant had been informing for money and favors since the 1970s. <br> · The 1998 murder-for-hire case was never prosecuted because the police did not gain enough |

22

| | | | |
|---|---|---|---|
| | testified, there is no information that he has ever been unreliable, and he has no substance abuse, medical, or other problems bearing on his testimony. | | evidence to prosecute, suggesting informant's lack of reliability. In fact, informant's information **never** led to a Culver City policy prosecution.<br>· Post-trial, defense counsel obtained informant's DOC records, which showed him to be a known liar seeking to manipulate the system.<br>· Post-trial: Informant was arrested for carjacking in 2006 and during a police interview related to that case offered to lie on the witness stand in exchange for a positive deal in his carjacking case. |
| Impeachment Information about Police Witnesses | · 9/21/04: "We are not aware of any impeachment information for the police officers who may be testifying. I | · No change | · LAPD records obtained by defense counsel from the City Attorney office revealed a sustained |

| | use the word 'aware' because we do not have possession, custody, or control over the disciplinary files of the police officers." · Filed a motion in limine to exclude evidence of complaints against officers, stating it was unaware of any relevant sustained complaints, even though the sustained complaint against Officer Fletcher was in the Government's possession. | | complaint against Officer Fletcher for submitting an arrest report that he knew contained inaccurate information. |
|---|---|---|---|

**Table 2:**

| Impeachment Available at Trial | Impeachment Revealed Only After 2nd Trial |
|---|---|
| · Informant was blind in one eye and had glaucoma in the other<br>· Informant was a former cocaine user<br>· Informant received $200 for his testimony and was relocated to hotel pre-trial<br>· Informant had been informing since the 1970s.<br>· Informant had been arrested "plenty" of times.<br>· Informant informed in a 1998 murder-for-hire case, but as | · Informant's DOC file revealed that he frequently violated prison rules, that he was segregated for being a snitch, that he was manipulative with his relations with staff, and that he threatened to escape punishment by lying<br>· Culver City Police Officer revealed that the 1998 murder-for-hire suspect did not go to prison because he was never prosecuted – that the informant's did not provide enough information for a |

| | |
|---|---|
| far as he knew the suspect never went to prison.<br>· Informant admitted to driving without a license, and to applying for a duplicate license even though he did not have a current valid one.<br>· Informant claimed that defense counsel's interview placed him at risk, but then admitted he was not "intimidated" and that the relocation was only for a short time.<br>· Informant admitted generally that he had told lies in the past to obtain benefits, but not as to specific instances.<br>· | prosecution, and that in fact the informant's information had **never** led to a prosecution in that office.<br>· LAPD's own records revealed that informant had first worked for the LAPD as early as 1984.<br>· Informant was arrested on a new charge in 2006; he offered to testify falsely in order to receive a benefit in his carjacking case. |

## II.   LEGAL STANDARD

"Federal courts have inherent but limited supervisory powers to formulate procedural rules." <u>United States v. Ross</u>, 372 F.3d 1097, 1109 (9th Cir. 2004) (internal quotation marks omitted), <u>on r'hg in part on other grounds</u>, 138 F. App'x 902 (9th Cir. 2005). District courts "may exercise [their] supervisory powers . . . in response to outrageous government conduct that falls short of a due process violations." <u>Id.</u>  This power "may be used to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws) governing matters apart from the trial itself." <u>Id.</u> at 1109-10 (internal quotation marks omitted).  In order to "justify exercise of the court's supervisory powers, prosecutorial misconduct must (1) be flagrant and (2) cause substantial prejudice to the defendant." <u>Id.</u>  (internal quotation marks omitted). Substantial prejudice occurs where "the government conduct had at least some impact on the verdict and thus redounded to the

defendant's prejudice." Id. (internal quotation marks and alterations omitted).

### III.    CONCLUSIONS OF LAW

The Court finds that the Government's conduct in this case requires that Defendant be afforded a new trial.[3]

### A.         The Government's Conduct Was Flagrant

The Government's failure to investigate and disclose impeachment information constituted flagrant misconduct. See United States v. Chapman, --- F.3d ----, 2008 WL 1946744, at *10 (9th Cir. May 6, 2008) (holding that failure to disclose exculpatory and impeachment information as required by the Constitution may constitute flagrant misconduct).

"The prosecution is obligated by the requirements of due process to disclose material exculpatory evidence on its own motion, without request." Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997) (citing Kyles v. Whitley, 514 U.S. 419, 432-34 (1995)). "Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses." Id. While, post-trial, a court will not reverse a conviction for a Brady violation unless the undisclosed evidence undermines confidence in the verdict, that is not the standard prosecutors are obligated to consider pre-trial; rather, pre-trial a prosecutor is obligated to disclose all evidence "which relates to guilt or

---

[2]    For this reason, the Court need not address Defendant's alternative argument that he should be granted a new trial based upon violations of Brady v. Maryland, 373 U.S. 83 (1963).

punishment, and which tends to help the defense by either
bolstering the defense's case or impeaching prosecution witnesses."
United States v. Sudikoff, 36 F. Supp. 2d 1196, 1199 (C.D. Cal.
1999) (internal citations omitted).  "[W]here doubt exists as to
the usefulness of evidence," the Government "should resolve such
doubts in favor of full disclosure."  Id. (internal quotation marks
omitted).  The Government's disclosure obligations extend beyond
information in the prosecutor's hands; indeed, "the prosecution has
a duty to learn of any exculpatory material known to others acting
on the government's behalf."  Carriger, 132 F.3d at 479-80.

        In this case, the Government violated its investigation
and disclosure duties.  There can be no doubt that the Government
in this case was aware of its obligations.  Defense counsel made
numerous specific requests seeking information; more importantly,
the Court made abundantly clear that it was concerned that the
Government had not sufficiently complied with  its Brady
obligations, and that "you [the Government] have more than an
obligation to simply learn things third-hand.  You have – if you
are dealing with an informant, you have an obligation to
affirmatively find out information that relates to that informant
that you can reasonably acquire."  (Mot. To Dismiss, Ex. O, at 125-
26.)  There is therefore no basis for the Government to contend
that somehow it was not aware of the requirement to disclose
impeachment information relating to its witnesses, that it had an
affirmative duty to discover that information, and that it could
not merely rely on the LAPD to relay that information third-hand.

The Ninth Circuit has recently emphasized as "particularly relevant" to a finding of flagrant misconduct "the fact that the government received several indications, both before and during trial, that there were problems with its discovery production and did nothing to ensure it had provided full disclosure." Chapman, 2008 WL 1946744, at *9. Here, despite explicit warnings from the Court, the Government failed to make even basic inquiries about the credibility of its primary witnesses. To name just a few examples: Instead of requesting the disciplinary reports about the LAPD police witnesses, the Government claimed it was not "aware" of any impeachment because it did not possess those reports. Even though it knew the informant had a lengthy criminal record, instead of requesting his DOC file the Government represented that "There is no impeachment information . . . other than what has already been provided to you." Even when it discovered that the informant had informed in a 1998 murder-for-hire case, the Government neglected to speak with any of the officers involved, instead relying on the informant's – false – claim that he was reliable because although he showed up to court, he was not called to testify.

The Government represented that the informant had no drug or medical problems that would bear on his testimony. It was not difficult to ascertain that the informant was at that time in drug treatment, his DOC file documented a lengthy history of drug abuse, and a simple question from defense counsel revealed the informant's eye problems. All these issues could affect the reliability of an informant's eyewitness identification, and yet the Government

represented, without any meaningful investigation, that the
informant had "no" such problems.

Similarly, the Government initially represented that the
informant began testifying in 2004.  Even when the prosecution
realized he had a history of informing since at least 1976, it
failed to investigate further, instead representing to the Court
that the 1976 incident was isolated.  (See Mot. To Dismiss, Ex. O,
at 136.)  Of course, had the Government investigated the
informant's history by, for example, requesting his DOC file, it
would have known that law enforcement officials were well aware
that this informant had a well-documented and lengthy history as an
informant who attempted to manipulate officials and was willing to
lie to help himself.  (Id., Ex. X.)

In fact, evidence of the informant's lengthy history was even
more obvious.  As the Government now acknowledges, the LAPD's own
records of using this informant date back to 1984.  The Government
contends it was not aware of this fact, and submits declarations by
several LAPD officers stating that at the time of Mr. Hector's two
trials they were not aware of these records or of the informant's
pre-2004 history with the LAPD.  Yet, when counsel for the
Government reviewed the informant's LAPD file with LAPD officers on
April 10, 2008, the 1984 records were present and in the file.

At the April 28, 2008 hearing on this motion, government
counsel blamed her experience for her failure to discover and
disclose this material earlier.  The Court does not disagree with
this characterization.  However, it does not change the material

29

facts that have led to this current situation: The Government
relied upon the LAPD for all information without conducting any
follow-up investigation despite a Court order to take a more
affirmative role in the investigation.  As is shown by the example
of the 1984 records, when government counsel conducted an **active**
investigation, important records immediately bubbled to the
surface. Yet, in direct violation of the Court's orders, the
Government persistently maintained it had no impeachment
information without making the necessary underlying inquiries.  As
such, the Government's conduct, even if unintentional, nonetheless
constituted "reckless disregard for [its] constitutional
obligations." United States v. Chapman, --- F.3d ----, 2008 WL
1946744, at *9 (9th Cir. May 6, 2008) (holding that "reckless
disregard" for obligations constituted flagrant misconduct where
the Government failed to produce Brady material while "repeatedly
represent[ing] to the Court that [it] had fully complied with *Brady*
and *Giglio*, when [it] knew full well that it could not verify these
claims," even if "the documents themselves were not intentionally
withheld from the defense").

     The Government attempts to justify its conduct by arguing
that it is "'under no obligation to turn over material not under
its control,' which includes Department of Corrections files and
state law enforcement personnel files." (Opp'n 17 (quoting United
States v. Dominquez-Villa, 954 F.2d 562, 565-66 (9th Cir. 1992);
United v. Aichele, 941 F.2d 761 (9th Cir. 1991)).  This argument is
unavailing.  Dominquez-Villa and Aichele were Ninth Circuit cases
issued before the Supreme Court made clear that willful blindness

is not enough; "the individual prosecutor has a duty **to learn** of any favorable evidence known to others acting on the government's behalf in the case, **including the police**." <u>Kyles</u>, 514 U.S. at 437 (emphasis added).  The Ninth Circuit has recognized this requirement, noting that "[b]ecause the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."[4]  <u>Carriger</u>, 132 F.3d at 480.

In fact, the Ninth Circuit has specifically held that when the prosecution

> decides to rely on the testimony of such a witness, it is the [prosecution's] obligation to turn over all information bearing on that witness's credibility.  This must include the witness's criminal record, including prison records, and any information therein which bears on credibility.  The [prosecution] had an obligation, before putting [the informant] on the stand, to obtain and review [his] corrections files, and to treat its contents in accordance with the requirements of <u>Brady</u> and <u>Giglio</u>.

<u>Id.</u> (internal citations omitted).[5]

In some instances, the federal government may not be responsible for material under the exclusive control of state officials because state law enforcement may not be acting as the agents of the federal government.  However, in this case, the

---

[4]   In other words, to the extent that pre-<u>Kyles</u> Ninth Circuit law focused on whether the information was in the "possession" of the government, <u>see, e.g.</u>, <u>United States v. Santiago</u>, 46 F.3d 885, 893-94 (9th Cir. 1995), that proposition has been supplanted by <u>Kyles's</u> prescription that the Government has a duty to learn of any exculpatory material known by others acting on the Government's behalf.

[5]   The Government attempts to distinguish <u>Carriger</u> by arguing that in this case Defendant was able to impeach the informant even without the DOC file, (Opp'n 16), but that question goes to prejudice, not to the prosecution's initial obligation of investigation and disclosure.

31

1  federal government relied completely on state officers to

2  investigate and present the case, depended solely on state officers

3  to vet its witnesses, and used state police officers' testimony to

4  vouch for the credibility of its informant before the jury.  For

5  example, when the issue of whether the Government had made

6  sufficient inquiries regarding impeachment evidence about its

7  witnesses, the Government acknowledged that the LAPD had been its

8  entire source of information about the informant:

9      **THE COURT:** Who made the inquiries concerning this informant.
10     Is this an L.A.P.D. informant?

11     **THE GOVERNMENT:** Yes, it is, Your Honor.

12     **THE COURT:**  What reasonable inquiries were made concerning the
       background and the services of the informant, and by whom?

13     **THE GOVERNMENT** Your Honor, the L.A.P.D. Officers who handled
14     the informant, they have whatever records of payments to the
       informant, and I believe that is what they used to determine –

15  (Mot. To Dismiss, Ex. O, at 122.)

16     **THE COURT:** Did you ask him about his history of working as an
       informant?
17
       **THE GOVERNMENT:** No. I asked the L.A.P.D. officers about that.
18
       **THE COURT:** But you briefed the informant, and you did not ask
19     him about his history of working as an informant, is that
       correct?
20
       **THE GOVERNMENT:** Your Honor, that was a really short conference
21     that we had that day.[6]

22     _____
           [6] The Government thus does appear to have met with the
23  informant once, for this "really short conference."  It is unclear
    what exactly transpired, because government counsel represented
24  both that she did not herself ask the informant about his history
    of informing, (id. at 123 ("No. I asked the L.A.P.D. officers about
25  that"), and that she did so ask him, (id. at 136 ("[W]e asked the
    informant about his prior informing . . . We meaning I".).  This
26  inconsistency may perhaps be chalked up to the nerves or
    inexperience of the government counsel.  Regardless, however, there
27  is no dispute that this conference with the informant was "really
    short" and that it did not occur until _after_ the first mistrial.
28  Further, it is undisputed that the Government took no action to
                                                    (continued...)

32

(<u>Id.</u> at 123.)

> **THE COURT:** Did anybody ask the L.A.P.D. for any records concerning the informant?
>
> **THE GOVERNMENT:** We do have the records of payment sheets, Your Honor, and those were turned over to the defense.
>
> **THE COURT:** Did you ask the L.A.P.D. to look for records prior to 2004?
>
> **THE GOVERNMENT**: The L.A.P.D. told me that they only had records of 2004.
>
> **THE COURT:** Who at the L.A.P.D. told you that? Was it one of the people that are witnesses in this case or someone else?
>
> **THE GOVERNMENT:** It may have been Officer Fletcher, but I don't remember who it was.

(<u>Id.</u> at 127.)

Under these circumstances, where the Government placed sole responsibility for vetting the informant with the LAPD, the Government had a responsibility to determine what information the LAPD had accumulated and whether that information was accurate. Any other conclusion would be tantamount to a ruling that the Government could evade its disclosure responsibilities by delegating investigative duties to state officials and then declining to ask those state officials – who had **all** the relevant information - what they had discovered.

Further, the Court is by no means imputing state knowledge to federal officials.  In this case, the Court explicitly expressed concern about whether <u>Brady</u> obligations were being fulfilled, and ordered the Government to investigate the informant independently,

---

[6](...continued)
corroborate any of the informant's representations.  Therefore, for all practical purposes, the Government relied entirely on the LAPD.

1  and not to rely solely on information passed through the LAPD,

2  especially when the LAPD source was known to be unreliable:

> When I deal with the federal government and prosecutorial
> agencies I [need to] feel like there has been due diligence on
> the <u>Brady</u> issue.  I am not feeling comfortable about it now in
> this case. . . . You [the Government] relied perhaps on the
> L.A.P.D. for this information.  There seems to be a gross
> discrepancy.

(<u>Id.</u> at 125.)

> But if you [the Government] make a decision to call him [the
> informant] the problem is still whether his history as an
> informant was not appropriately disclosed through – you know,
> again through either not asking the questions correctly or,
> you know, the answers being filtered in some way by . . .
> Officer Fletcher.

(<u>Id.</u> at 133.)

    The question before the Court is therefore not whether the
Government should have independently realized that it could not
rely solely on LAPD representations.  The question is not whether
the Government can ever, under some hypothetical set of
circumstances, rely on the LAPD's representations.  The point,
rather, is about the circumstances of this case.  The point,
rather, is that the Government - persistently and recklessly -
failed to conduct a reasonable investigation of its informant **even
after** 1) direct questioning from defense counsel; and 2) explicit
orders from the Court.

    The Court finds that the Government's entire investigation of
the informant can be summarized as follows:

- Pulled and disclosed the informant's rap sheet with all
  identifying information, including aliases, redacted

34

- Relied on the LAPD to provide all impeachment information about the informant.  The Government **cannot remember or is refusing to disclose** the identity of the LAPD officer(s) who served as the source for this information, but it "may have been Officer Fletcher," who, as has been discussed, has his own significant credibility problems.

- Had one "really short conference" with the informant that did not occur until after the first mistrial, and took no follow-up action to corroborate any of the informant's representations.

The Court finds that instead of conducting its own affirmative investigation, the Government has consistently acted in an entirely defensive or responsive manner, relying completely on the information provided by the LAPD.  Then, riding on the coattails of defense counsel's work, whenever defense counsel has discovered additional or different information on her own, the Government has adopted that information and asserted that **now** there is no more impeachment.  Such a response does not constitute compliance with the Court's orders, but is rather a passive attempt to insist, without actually investigating, that the totality of impeachment is whatever has already been revealed.  Such reckless behavior cannot be condoned because it invites a failure to discover and disclose crucial evidence that the defense has a constitutional right to review.

Further convincing the Court that the Government violated Court orders is that fact that it has failed to disclose

1   information directly in its possession.  Even after defense counsel

2   subpoenaed Officer Fletcher's disciplinary reports, which were

3   delivered to both the Government and defense counsel, and which

4   documented a sustained complaint against Officer Fletcher for

5   reporting inaccurate information, the Government nonetheless

6   represented to the Court it was not aware of any sustained

7   complaints.[7]

8       The failure to identify and disclose the impeachment evidence

9   against Officer Fletcher is particularly important because Officer

10  Fletcher was an important source – possible the most important

11  source – of information about the informant.  Accordingly, the

12  Government's recklessness as to the gathering of information

13  regarding Officer Fletcher's credibility bleeds into its

14  ─────────────

15      [7]  In a motion in limine "to exclude evidence of complaints
    filed against LAPD Officers," the Government represented that

16  "there do not appear to be any sustained complaints against any of
    the officers relating to their credibility."  (Mot. In Limine 1.)

17  The Government argues that "the point of that particular motion"
    was to "preclude any unsustained complaints."  (Tr. Hearing Apr.

18  28, 2008, at 30:5-8.)  It is true that the motion does conclude
    with the Government's request to "preclude defendant from

19  introducing any evidence of any complaints against the officers in
    this case other than sustained complaints relating to dishonesty."

20  (Mot. In Limine 4.)  Regardless of whether the motion was aimed at
    sustained or unsustained complaints, however, the Government

21  nevertheless represented that "The Government is aware that the
    defendant has subpoenaed documents from the officers' personnel

22  files in this case.  However, the government is not aware of any
    sustained complaints involving dishonesty against any of the

23  officers."  (Id. at 3.)  This representation is misleading because
    the **Government**, as well as defense counsel, had received the

24  personnel files by this point.  (See Tr. at 30:13-14.)  Thus, once
    again, the Government made representations without having performed

25  the necessary underlying investigation, and those representations
    proved inaccurate.  In this particular instance, government counsel

26  did not even take the minimal steps of reviewing the documents **in
    her own possession** before making baseless representations to the

27  Court.  Government counsel's inexperience may well have caused this
    reckless behavior; the effect nonetheless is that the Court cannot

28  credit the accuracy of the Government's representations in this
    case.

1  recklessness as to the gathering of information regarding the

2  informant.

3      The Government argues that the conduct in this case is less

4  severe than that in other cases in which the Ninth Circuit has

5  declined to find egregious conduct.  (Opp'n 11.)  Those cases are

6  distinguishable.  Most importantly, none involve a situation where

7  the Government failed to comply with express court orders to

8  investigate and provided false answers to specific questions

9  regarding an informant.  Cf. United States v. Bernal-Obeso, 989

10 F.2d 331, 337 (9th Cir. 1993) (remanding for evidentiary hearing on

11 governmental misconduct in failing to discharge Brady obligations

12 and leaving open the possibility of ordering a new trial or "of

13 dismissing the indictment" should the court "uncover egregious

14 wrongdoing by the government").

15

16     Further, most of the cases relied upon by the Government

17 involve the claim that outrageous government conduct violated a

18 defendant's **due process** rights.  See, e.g., United States v.

19 Gurolla, 333 F.3d 944, 950 (9th Cir. 2003); United States v. Matta-

20 Ballesteros, 71 F.3d 754, 762-64 (9th Cir. 1996) (as amended);

21 United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir. 1995);

22 United States v. Simpson, 813 F.2d 1462, 1464-65 (9th Cir. 1987).

23 The standard for establishing a due process violation based on

24 outrageous government conduct is indeed high; the "defense . . . is

25 limited to extreme cases in which the government's conduct violates

26 fundamental fairness and is shocking to the universal sense of

27 justice mandated by the Due Process Clause of the Fifth Amendment."

28 Gurolla, 333 F.3d at 950 (internal quotation marks omitted).

However, Mr. Hector is not alleging that his due process rights were violated.  He seeks a remedy through this Court's supervisory power to prevent the Government from reaping benefits from misconduct that "falls short of a due process violation," and that standard, as discussed, requires only that the misconduct be "flagrant" and that the misconduct have "some impact" on the verdict.  Ross, 372 F.3d at 1109-10 (internal quotation marks omitted).  As relevant here, the use of supervisory powers "is an appropriate means of policing ethical misconduct by prosecutors." United States v. Lopez, 4 F.3d 1455, 1463 (9th Cir. 1993).

    United States v. Alvarez, 317 F. Supp. 2d 1163, 1164 (C.D. Cal. 2004), is instructive.  In that case, the defendants were charged with methamphetamine offenses.  In response to defendants' requests for discovery regarding any and all informants, the Government responded that there was only one informant and that there was no impeachment information for that informant.  Id. at 1164.  The Government had advised the defense that the single informant had worked only for the Drug Enforcement Agency ("DEA") and no other agency, and that he had not worked outside the state of California.  Id.  All this information proved incorrect. Further, the Government failed to disclose that there was a "sub-informant" who worked under the informant.  Id. at 1165-66.  When the defense brought this information to the court's attention, the court ordered full disclosure of this impeachment material, but the Government filed a notice of non-compliance.  Id. at 1165.

    The court found prejudice, emphasizing that "[a] law enforcement agency must not be allowed to shield itself from

38

accountability by hiring someone outside of law enforcement who is free to violate citizens' rights." Id. at 1167.  The court reasoned:

> Either the Government did not know about the use and assistance of the sub-informant . . ., or the Government deliberately lied to the defense in this case.
>
> If the Government did not know about the existence and utilization of the sub-informant, then its ability to monitor, regulate, and control the actions of its [informants] is seriously compromised.  If the Government did know about the sub-informant, but deliberately withheld this information from the defense, that is an even greater evil.
>
> ****
>
> Representations made by the Government in this case concerning the history and lack of impeaching material concerning the [informant] simply cannot be relied on by the defense or this Court.
>
> By using an intermediary to do the actual work . . ., the DEA attempts to insulate itself from inspection and examination and from any charges of improper conduct.
>
> ****
>
> Defendants are entitled to discovery which will provide them with reliable information about the background, credibility, record, and prior activities of an [informant] used by the Government in a case where information provided in discovery is proven to be wrong. . . .

Id. at 1166-67.

As in Alvarez, the Government in this case - even if unintentionally - has effectively used an intermediary "to insulate itself from inspection and examination and from any charges of improper conduct."  Here, that intermediary was the LAPD.  The Court finds, therefore, that the Government has committed flagrant misconduct by refusing to investigate its witnesses in violation direct Court orders and its Brady obligations.

**B.   The Government's Conduct Redounded to the Defendant's Prejudice**

1    Once egregious government conduct has been established, the
2    prejudice standard is low; Defendant must show only that the
3    Government's flagrant conduct had "at least some impact on the
4    verdict."  Ross, 372 F.3d at 1110 (internal quotation marks
5    omitted).   This prejudice standard is "a less stringent standard
6    than the Brady materiality standard," id., which requires a
7    showing that the "suppressed evidence would have created a
8    'reasonable probability' of a different result," United States v.
9    Jernigan, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc)
10   (internal quotation marks omitted).  A 'reasonable probability' of
11   a different result does not mean that a defendant would more
12   likely than not have received a different verdict; "[i]nstead, [a
13   defendant] must show only that the government's evidentiary
14   suppression undermines confidence in the outcome of the trial."
15   Id. (internal quotation marks omitted).  Because the standard for
16   egregious government conduct is lower than that required to show
17   prejudice under Brady, Mr. Hector does not even need to
18   demonstrate that the misconduct undermines confidence in the
19   trial.  Any impact on the trial at all will suffice.  Under the
20   circumstances in this case, Mr. Hector has met his burden.

21   The Government's primary argument for why the defendant has
22   not suffered any prejudice is that defense counsel was able to
23   discover much of the impeachment evidence in time to present it at
24   trial, and any impeachment disclosed post-trial would have been
25   cumulative.  Put another way, the Government contends that defense
26   counsel through her own efforts was able sufficiently to impeach
27   the informant such that the extra evidence would have had no

40

1 impact on the verdict.

2

3      The Court disagrees.  As a preliminary matter, the Court notes
that the Ninth Circuit has emphasized that "the government cannot

4 satisfy its *Brady* obligation to disclose exculpatory evidence by

5 making some evidence available and claiming the rest would be

6 cumulative.  Rather, the government is obligated to disclose *all*

7 material information casting a shadow on a government witness's

8 credibility."  <u>Carriger</u>, 132 F.3d at 481-82 (internal citations

9 omitted).  Therefore, the fact that impeachment information may

10 ultimately prove cumulative does not excuse the Government from

11 investigating and disclosing it.

12

13      More importantly, in this case important information was not

14 revealed during trial.  Defense counsel was able to elicit that

15 the informant had a criminal history, had been an informant in the

16 past, had vision problems, and had, generally, "told lies in the

17 past to get benefits." (Mot. To Dismiss, Ex. P, at 250.)  The

18 jury missed crucial points, however.  For example, the jury did

19 not learn of the information contained in the DOC records, which

20 revealed that California authorities had known him for decades to

21 be a "snitch jacket," and an informant who threatened to beat the

22 system "by lying." (<u>Id.</u>, Ex. X, at 420-21, 532.)  Similarly, the

23 jury did not hear from Lieutenant Chris Gutierrez of the Culver

24 City Police Department, who was involved in the 1998 murder-for-

25 hire case for which the informant provided information.

26 Lieutenant Gutierrez would have testified that contrary to the

27 informant's contention that he had shown up to court but was not

28 called to testify, in fact the suspect had never been prosecuted

41

because the informant had provided insufficient information.
(Chen Decl. ¶ 39.)   Indeed, Gutierrez would have testified that
none of the information the informant provided to the Culver City
Police **ever** led to any prosecution because there was "not enough
information to prosecute," and that the informant knew how to
"play both sides" of the system.   (Id.)

     This information is important evidence that local authorities
viewed the informant with skepticism because he was known to
manipulate the system and to lie to help himself, and because his
information, at least with respect to one department for which he
informed, had never led to any prosecutions.   Hearing that an
informant has a criminal record or has lied in the past about
nonspecific events is different in kind from hearing that law
enforcement officials themselves had for decades considered the
informant to be a manipulative individual with a pattern of lying
to serve his own interests.   Defense counsel exerted great effort
at trial attempting to paint the informant as a liar by showing he
had lied regarding such relatively trivial matters as DMV
application forms.   Biting impeachment material such as the DOC
report and Lt. Gutierrez's comments would have allowed defense
counsel to attack the informant's credibility much more
efficiently and effectively.

     The Government argues that because the informant was never
painted as an angel, this extra information would have made no
difference.   Yet, when at trial defense counsel tried to argue
that the informant was unreliable using the impeachment that she
did have, (see Tr. at 606-08), the Government in closing argument

explained away the informant's questionable credibility by relying
on Officer Fletcher's – who, as has been discussed, had a
sustained complaint against him for inaccuracy – testimony that
this informant had always been reliable, (Mot. To Dismiss, Ex. V,
at 337.).  The Government therefore urged the jury that while the
informant might have lied in the past, "all this talk that he is
unreliable . . . is just exaggeration."  (Id.)

In other words, the Government itself obviously appreciated
the pivotal nature of the informant's credibility because it urged
in closing argument that although the informant was not perfect,
he had consistently been a reliable source for the Government, and
was telling the truth in this case.  (Id. at 340); see Carriger,
132 F.3d at 482 (holding that the defendant had suffered prejudice
from a Brady violation where the prosecutor had "vouch[ed] for
[the informant's] truthfulness in closing argument").  Defense
evidence that government officials had in fact known him to be
manipulative and unreliable could have severely undermined the
Government's argument.  Without this information, the jury might
have chalked the informant's unreliability up to a few isolated
incidents.  With the evidence, it reads much more like a pattern.

The Government's misconduct and apparent indifference to the
Court's orders are particularly significant, and the prejudice
particularly apparent, because this case was so simple.  This case
was comprised almost entirely of circumstantial evidence, and
Defendant had an explanation for everything:  The money belonged
to his friend, Jordan Berhe, and she corroborated this at trial.
The culprit was his missing roommate, and despite the Government's

43

skepticism as to the viability of this defense, Mr. Hector's apartment manager confirmed the roommate's existence at trial. Therefore, the informant - as the only direct evidence tying Defendant Hector to the crime - was a crucial witness.

Given the Government's misconduct in consistently - and in flagrant violation of Court orders - refusing to investigate the background of its witnesses, Defendant need only show some impact on the verdict.  The Court is convinced that had the jury heard that other law enforcement officials had in fact long considered the informant to be manipulative and willing to lie, it would have been less likely to believe him.

**C.   Remedy**

Although the Court, with its busy docket, wishes this were not the case, it has concluded that the most effective remedy for the government's misconduct is to grant a new trial.

This case has a troubled history.  The LAPD's lead investigator caused a mistrial by responding to a government question in a manner not only non-responsive, but essentially guaranteed to result in a mistrial.  The Court will never know whether Officer Fletcher intended to cause a mistrial, whether he hoped to prejudice the jury with inadmissible evidence, or whether he had an inadvertent "lapse" in judgment.  Regardless, this conduct was of a kind that the Court has never - before then or since - experienced with any other law enforcement officer.

This case was then set for a second trial.  Brady issues were raised and raised again.  The Court held several hearings.  The

Government made representations that suggested it had not been complying with its affirmative duties to seek out impeachment information in a diligent fashion.  The Court was therefore placed in the position of having to explain to the Government that its Brady responsibilities transcend superficial inquiry.

There appears to have been - and may still be - a disconnect between the Court's orders and the Government's appreciation of the seriousness of its duties under Brady.  The Government should not be taking a "no harm, no foul" approach to Brady; that is, it should not be making the argument that defense counsel was able to discover through expense and diligence most of the Brady material anyway.  The Court should not have to order the Government to fulfill its constitutional obligations at all, much less repeatedly and without faith that the orders will be followed. Indeed, for the sake of the integrity of our system of justice, courts must depend on the Government's compliance with their orders.

The Court seriously considered dismissing the indictment. The Government has taken the position it had no obligation to investigate what state law enforcement knew about the informant. Given a situation where, as in Alvarez, "information provided in discovery is proven to be wrong," see 317 F. Supp. 2d at 1167, and where the information has only been corrected to the extent that defense counsel's own investigation has revealed error, the Court

1   has lost confidence that the Government in this case even now has

2   complied with its full investigation and disclosure obligations.[8]

3       For example, defense counsel has already uncovered a 2006

4   interview of the informant by the police in which the informant

5   offered to "tell a whole different story" in court if it would

6   help him.  (Mot. To Dismiss, Ex. S, at 309.)  While this event

7   occurred after Mr. Hector's trial, the Court is concerned that the

8   informant may have made other comments that similarly undermine

9   his credibility but that have not yet been discovered due to the

10  Government's persistent failure to investigate.  See Bernal-Obeso,

11  989 F.2d at 333-34 ("By definition, criminal informants are cut

12  from untrustworthy cloth and must be managed and carefully watched

13  by the government and the courts to prevent them from falsely

14  accusing the innocent, from manufacturing evidence against those

15  under suspicion of crime, and from lying under oath in the

16  courtroom.").

17

18      Similarly, the Government represented that the LAPD records

19  showed that the informant began informing in 2004.  Now, the

20  Government acknowledges that those records in fact date back 1984.

21  The Court is concerned that additional records of the informant's

22  substantial informing activities, whether in the possession of the

23  LAPD or other law enforcement departments, that contain

24

25

26      [8] The comments here are not directed to typical government
    conduct.  In this Court's experience, the Government takes its
27  Brady obligations seriously.  It is not unusual for the prosecution
    to err on the side of completeness or to ask the Court to review,
28  in camera, material that may arguably be exculpatory under Brady.
    The Court therefore regards this case as an unfortunate aberration.

substantial additional impeachment material, may yet remain
undisclosed.

In short, the Court repeatedly made clear to the Government
that it needed to conduct a more probing inquiry into its
witnesses because the investigation to that point had been
unsatisfactory.  Instead of following this directive, the
Government recklessly continued to rely entirely on the LAPD's
affirmative representations and wait for defense counsel to
discover additional material.  Government counsel asserts that any
failings result from her inexperience, and the Court is willing to
accept that contention.  Nevertheless, as the impeachment material
discovered by defense counsel piled up, the Government should have
quickly realized that it was failing to engage in the type of
genuine, diligent inquiry that this Court ordered and that,
indeed, is required by law.

However, the Court is cognizant of the fact that dismissal of
the indictment is an "extreme remedy" that is only justified where
"no lesser sanction could adequately preserve judicial integrity
and deter future governmental misconduct."  Lopez, 4 F.3d at 1463-
64.  The Court believes that a new trial where the defense may
introduce all additional evidence regarding the informant, and
where the Government will conduct a more thorough investigation,
will suffice as a sanction.  See United States v. de Cruz, 82 F.3d
856, 867-68 (9th Cir. 1996) (observing that a new trial may be a
remedy for outrageous government conduct).

1     The Court emphasizes that the Government's credibility in this

2   case has been compromised.   The Court expects that the Government

3   will fully comply with the law and the spirit of <u>Brady</u> concerning

4   the informant and any other witnesses it plans to use on retrial.

5   It will **not** be sufficient for the Government to assert that all

6   impeachment material "that it is aware of" has already been

7   disclosed.   The Government must independently research this (and

8   any other) informant.

9   ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   **III.     CONCLUSION**

16

17     Based on the foregoing analysis, the Court hereby DENIES

18   Defendant Hector's motion to dismiss the indictment, but GRANTS

19   his request for a new trial.

20

21

22   IT IS SO ORDERED.

23

24

25   Dated: May 8, 2008

26                                           DEAN D. PREGERSON

27                                           United States District Judge

28